**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Jonathan Woon Teck Yap, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Northwestern University, | ) |
| | ) |
| Defendant. | )          Jury Trial Demanded |

**COMPLAINT**

NOW COMES the Plaintiff, Jonathan Woon Teck Yap, through his attorneys, O'Connor |
O'Connor, P.C., and, as for a Complaint against the Defendant, Northwestern University,
alleges and shows to the Court, as follows:

**NATURE OF ACTION**

1.    Plaintiff Jonathan Woon Teck Yap ("Yap") brings this action under Title IX of the
Education Amendments of 1972 to redress the unlawful discrimination, hostile
environment, and retaliation by Defendant Northwestern University ("Northwestern")
after he reported sexual harassment and retaliation committed by Northwestern's
employee Professor David Engman.

2.    Specifically, Plaintiff seeks to be made whole for the damage caused by Northwestern
University's deliberate indifference in handling his sexual harassment complaint,
remedying the harassment and retaliation he has been subject to, including, but not
limited to the full payment of compensation for his loss and delay of academic

1

accomplishment; loss of income; compensation for his emotional distress; proper remedial actions regarding his claim; and attorney's fees and costs.

## JURISDICTION AND VENUE

3.   Plaintiff brings this action pursuant to Title IX of the Education Amendments of 1972, Section 901(a), as amended, U.S.C. Section 1681 (a) ("Title IX"). This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

4.   Venue is proper under 28 U.S.C. 1391(b) because the events giving rise to the claims alleged herein occurred within the Northern District of Illinois.

## GENERAL FACTUAL ALLEGATIONS

5.   Plaintiff Jonathan Woon Teck Yap is a 32 year old male and is enrolled as a full-time student at Defendant Northwestern University in the Medical Scientist Training Program (the "MSTP"), a combined degree program in which students simultaneously complete the M.D. and Ph.D degrees. The name MSTP is used by the combined degree programs which are supported in part by a federal grant from the National Institute of Health. Plaintiff is completing the third year of medical school and is expected to complete his M.D. degree in May 2016.  Plaintiff completed his Ph.D. degree in 2013 in the Department of Chemical and Biological Engineering at Defendant Northwestern University. He has been a student of Defendant Northwestern since 2007.

6.   Defendant Northwestern University is an institution of higher education duly organized and existing under the laws of the State of Illinois which received federal financial assistance for its education program.

7.     In or about October 2006, Plaintiff was recruited for Defendant's MSTP by David
       Engman ("Engman"), who was the Director of MSTP at that time.

8.     During the  admissions interviews conducted in Fall 2006, Engman presented to the
       applicants who had been invited to interview the option to simultaneously pursue a third
       degree, the Master of Science in Clinical Investigation (the "MSCI"), as a unique feature
       of the MD-PhD program offered at Northwestern. Other MD-PhD programs did not offer
       to MD-PhD applicants the option to simultaneously earn a degree similar to MSCI.

9.     Northwestern offered admission into its MSTP on a rolling basis to the most qualified
       applicants and Plaintiff was one of the first students to be offered admission. On
       December 19, 2006, Plaintiff received an offer of admission to the MSTP, which
       included all years while earning both the MD and PhD degrees. This offer included an
       MSTP tuition scholarship (full tuition), a stipend, and health and disability insurance.

10.     In an effort to secure Plaintiff's enrollment to the program, Engman proactively
       informed Plaintiff in Winter 2007 that he was nominating Plaintiff for the inaugural Ryan
       Fellowship to recruit Plaintiff to Northwestern at all costs. Engman assured Plaintiff on
       several occasions that MSTP would supplement Ryan Fellowship after the initial five
       years and he stated that he did not want Plaintiff to even "have a question of whether or
       not he would have the Ryan Fellowship after the first 5 years."

11.    Because of Engman's assurance and representation on the continued Ryan Fellowship
       and opportunity to pursue the MSCI degree, Plaintiff turned down competing offers of
       admission to MD-PhD programs at other universities and decided to enroll in the MSTP
       at Northwestern in Summer 2007.

12.     In July 2007, Plaintiff enrolled as a combined degree student in the MSTP at Northwestern.

13.     Within 3 months after Plaintiff enrolled in MSTP, Engman started to sexually harass Plaintiff numerous times, making suggestive comments about Plaintiff's physical appearance while conspicuously looking at Plaintiff and ogling him.

14.     In August 2007, Engman complimented Plaintiff's teeth while looking at him leeringly and smiling at him in a lascivious manner while they were together on Engman's boat at the 2007 annual off-campus MSTP retreat (attendance at this retreat was mandatory). At that time of this statement by Engman, Plaintiff was only wearing a bathing suit.

15.     In September 2007, while Plaintiff was together with Engman in the MSTP office conference room, Engman again made reference to Plaintiff's teeth while looking at him leeringly and smiling at him in a suggestive manner.

16.     Around this same time, upon information and belief, Engman began inquiring as to Plaintiff's sexual orientation from several of Plaintiff's fellow students at Northwestern.

17.      At one point, Engman also made a disparaging comment about students of Asian origin to Dr. Sandra Lee, who was the MSTP Associate Director at that time, asking her to stop bringing "these chinks" into the MSTP program.

18.     In or around November 2007, Engman started to retaliate against Plaintiff by interfering with his academic accomplishments and opportunities when Plaintiff did not respond to his repeated sexual advances and sexually suggestive comments. This retaliation took the form of, *inter alia*: opposing Plaintiff's application for the International Health Fellowship (IHF) offered by Northwestern University's Feinberg School of Medicine;

opposing Plaintiff's acceptance of the IHF after he was selected; and personally assigning Plaintiff an Unsatisfactory grade for the Summer 2008 MSTP Grand Rounds course even after Plaintiff had completed all the requirements *in lieu* of being physically present for the course, an arrangement that Engman had previously stipulated.

19.     Plaintiff was denied a paid leave of absence by Engman when he requested one for a family emergency. Engman routinely granted paid leaves of absence to other students with family emergencies.

20.     During the whole time he was at MSTP, Engman continuously sabotaged Plaintiff's academic opportunities and deprived Plaintiff of many benefits that other similarly situated students enjoyed. Whenever Plaintiff requested explanation on Engman's adverse decisions against him, Engman used that opportunity to attempt to force Plaintiff to meet with him in private.

21.     In or around August 2010, Engman arranged a ride-share for Plaintiff to the 2010 annual off-campus MSTP retreat (attendance was compulsory) so that he would be in the vehicle alone with Plaintiff. Plaintiff declined Engman's offer and used other means of transportation to get to the retreat.

22.     At the retreat, Engman approached Plaintiff when he was sitting with a classmate at a pool in his bathing suit and commented that Plaintiff "had really nice hair" while leering at and smiling at him creepily in a lascivious manner. Engman also said that Plaintiff's "hair was really long and needed to be cut," and then invited Plaintiff to come by his hotel room later that night so that he could cut Plaintiff's hair using a pair of scissors he had with him. Engman's invitation was made with a very provocative sexual overtone.

23. Later that same evening, Engman came up to Plaintiff again while he was participating in the mandatory attendance dinner with his classmates and stated that "You [Plaintiff] have the most beautiful hair that I have ever seen. Don't you all agree?"

24. About a month after the 2010 MSTP retreat, Engman made comments on Plaintiff's hair and teeth in an inappropriate and sexually suggestive way again when Plaintiff met with him in his office to request assistance with a class.

25. When Plaintiff did not respond to his propositions, and spurned and rebuffed his sexual advances again, Engman retaliated by sabotaging Plaintiff's application for the Howard Hughes Medical Institute (HHMI) International Student Research Fellowship by not forwarding Plantiff's application to the HHMI for consideration. Due to Engman's willful interference with Plaintiff's application process, he lost an opportunity of enhanced income and scholastic prestige. Moreover, Plaintiff's future career advancement as an academic physician was damaged as well.

26. In August 2011, Engman again schemed to force Plaintiff to share a ride with him to the 2011 annual off-campus MSTP retreat (attendance was mandatory), which Plaintiff declined. Plaintiff was not able to attend the retreat because he had to remedy an emergency in his thesis advisor's laboratory, which was one of his primary responsibilities as a Ph. D student.

27. Later, in or about November 2012, Dr. Jayms Peterson ("Peterson"), who has been the MSTP Assistant Director since 2012, showed a disciplinary letter issued by Engman and Dr. Elise Covic ("Covic") that was placed into his MSTP student folder filed. Covic was the MSTP Associate Director from 2010 to 2011. The letter reprimanded Plaintiff for not

attending the annual MSTP retreat in 2011. It also stated that Plaintiff was required to
travel to the retreat in Michigan with Engman in his private car, and reprimanded
Plaintiff for missing the 2011 MSTP retreat even though it was common for MSTP
students to not attend these annual retreats for various reasons. The Program never issued
letters of reprimand to other MSTP students who did not attend MSTP annual retreats.

28.     In or about October 2011, Engman was replaced by Dr. Dane Chetkovich ("Chetkovich")
as the Director of the MSTP, shortly after a sexual harassment complaint was lodged
against him and a suit was filed against Northwestern by the then MSTP Associate
Director Elise Covic.

29.     Even after removal from the position of MSTP Director, Engman still exerted control
over the MSTP and continued to retaliate and harass Plaintiff directly and indirectly
through his successor, Chetkovich. Chetkovich continued to discuss matters related to
Plaintiff with Engman.

30.     In July 2012, Plaintiff got an email informing that MSTP students could not pursue the
Master of Science in Clinical Investigation ("MSCI") degree even though Engman
personally promoted pursuit of the MSCI degree as one of the benefits of the MSTP at
Northwestern to Plaintiff when he was being recruited. At this point, Plaintiff had already
completed almost all of the requirements for the MSCI degree.

31.     Plaintiff asked Chetkovich to look into the situation and Chetkovich consulted Engman.
Engman informed Chetkovich that there was no formal arrangement made between
MSTP and MSCI to offer the option to pursue a third degree to MSTP student, even
though it was understood that MSTP students could take MSCI classes. Engman's such

statement was strikingly contrary to the representation he had made to Plaintiff when he was actively recruiting Plaintiff to MSTP.

32. Contrary to what Engman had presented to Chetkovich, Plaintiff is intimately aware of the fact that Oyinlolu Adeyanju ("Adeyanju") was conferred the MSCI degree with MSTP's support and assistance in 2011. Adeyanju was a similarly situated MSTP student who was recruited, interviewed, and offered admission in the same 2006-2007 admission cycle as Plaintiff. Adeyanju heard the same recruitment presentations made by Engman and took the same MSCI courses as the Plaintiff. Adeyanju was admitted to and matriculated in the MSTP in 2007, the same year as Plaintiff, obtained a Ph.D. in Bionedical Engineering, and is currently completing the MD degree, similar to Plaintiff. Adeyanju personally communicated to Plaintiff in 2012 that the MSTP administration proactively and enthusiastically supported and negotiated his pursuit and conferral of the MSCI degree in 2011, when Engman was the Director of the MSP.

33. In or about September 2012, Plaintiff noticed that his stipend was missing the Ryan Fellowship supplement he had been receiving for five years since he enrolled at Northwestern in 2007. Plaintiff informed Chetkovich of the situation and explained to him that it was Plaintiff's understanding that the MSTP would provide the Ryan Fellowship for remainder of his training at Northwestern.

34. Plaintiff's such understanding is based on the information he received in 2008 from then MSTP Associate Director, Dr. Sandra Lee ("Lee"). Lee discussed Plaintiff's Ryan Fellowship matter with Engman extensively in 2007 during the recruitment of Plaintiff and again in 2008. Both times Engman told Lee that he had committed that MSTP would

pay Plaintiff's Ryan Fellowship until Plaintiff completed both MD and PD degrees, typically for the sixth through eighth year.

35. However, when Chetkovich inquired Engman of this matter, Engman told Chetkovich that he had instructed Lee to retract his offer. Engman also told Lee to state to Plaintiff that Engman's commitment for MSTP to pay Plaintiff in Years 6-8 of his training, the same stipend supplement that Plaintiff's Ryan Fellowship had paid to Plaintiff in Years 1-5, was an assumption on her part.

36. Due to Engman's continuous harassment and retaliation against Plaintiff, not only did Plaintiff lose a prestigious Fellowship, which was injurious to his future career, but also Plaintiff's relationship with the new MSTP leadership has been irreparably damaged. The new director, who did not understand the nature of relationship between Plaintiff and Engman, started to believe that Plaintiff was a problematic student seeking to create administrative difficulties.

37. Due to this misunderstanding about Engman's commitment for MSTP to pay the same stipend supplement in Years 6-8 of Plaintiff's training, Chetkovich (along with Associate Directors, Sarah Rice, Ph.D., and Hossein Ardehali, M.D., Ph.D., and Assistant Director, Jayms Peterson, Ph.D.) issued to Plaintiff a disciplinary letter stating that Plaintiff was presenting facts that he knew to be incorrect or incomplete with the intent to secure financial gain, which was far from the truth.

38. In order to explain the continued adverse decisions against him and academic and administrative complications created against him due to Engman's retaliation, in or about late November, 2012, Plaintiff told his Ph.D. thesis advisor in the Department of

Chemical and Biological Engineering, Dr. Lonnie Shea ("Shea"), that Engman has been sexually harassing him and retaliating against him for rebuffing Engman's sexual advances.

39. Shea told Plaintiff that he was required to report the sexual harassment to Northwestern's Sexual Harassment Prevention Office. Shea informed Joan Slavin ("Slavin"), the Director of Sexual Harassment Prevention Office at Northwestern, that Plaintiff had been sexually harassed by Engman.

40. Plaintiff was not contacted by Slavin or any employees or agents of Northwestern regarding the sexual harassment report made by Shea.

41. Later, Shea informed Plaintiff that Northwestern stated that it "will not follow up" with the report given that "it happened 2 years ago."

42. Upon information and belief, Northwestern investigates such similar sexual harassment complaints filed by female students, and on at least one occasion, Northwestern followed up and investigated a sexual harassment complaint filed by a female student even though the reported incident happened 2 years ago.

43. After realizing that Northwestern will not take any action on the matter, on March 5, 2013, Plaintiff reached out to Slavin to request an investigation. Slavin was not prompt in finding a suitable date to meet with Plaintiff and scheduling an appointment.

44. Finally, in or about April 2013, Slavin met with Plaintiff and his medical school faculty mentor Dr. Deborah Reed. It was six months after the initial report of the sexual harassment by Shea and more than a month after Plaintiff contacted Slavin despite Northwestern's policy requiring prompt handling of complaints of sexual harassment and

10

its knowledge of the previous sexual harassment complaint lodged against Engman's by former employee and MSTP Associate Director, Covic.

45.     Slavin also talked to Engman, Chetkovich , and Dr. Rex Chisholm, who is the Associate Vice President for Research and Vice Dean for Scientific Affairs and Graduate Education at the Feinberg School of Medicine.

46.     However, Slavin did not interview the key witnesses to the incidents of Plaintiff's sexual harassment and retaliation, including but not limited to his classmate Ms. Alison Affinati and Lee, even though they were present at several incidents of harassment by Engman.

47.     Moreover, Slavin did not promptly concluded the investigation even after Plaintiff and Reed followed up with her on several occasions.

48.     Frustrated by Northwestern's handling of his complaint, on or about May 30, 2013, Plaintiff filed an EEOC charge.

49.     While the investigation on his sexual harassment complaint was pending with the Sexual Harassment Prevention Office, Plaintiff contacted Peterson to request for an exception to the MSTP's requirements in order to return to the third year of medical school. The policy sets forth that students meet two requirements – award of Ph.D degree and acceptance of a first author publication with minor revisions and not requiring additional experiments – before an MSTP student is allowed to return to the 3rd year of medical school ("M3 year").

50.     Plaintiff requested the exception because he could not schedule his Ph.D. thesis defense in June 2013 due to scheduling conflicts of his thesis committee members even though his first author paper had already been accepted for publication. Plaintiff's return to M3

year would be delayed by several months if the exception was not granted. Plaintiff was aware that exceptions to this MSTP requirement had been granted to other MSTP students in the past.

51.    Peterson visited Plaintiff the next day and communicated that there would be no such exception and confirmed the in-person communication via e-mail as well.

52.    Shea and Plaintiff were further told that there would be no exceptions to the MSTP dual requirement policy for returning to the clinic, because MSTP had re-announced and implemented the dual requirement policy without any exception since Chetkovich took over as MSTP Director.

53.    Contrary to Peterson's assertion, Plaintiff was aware that one of Plaintiff's MSTP classmates, Ye Yuan ("Yuan"), was granted this same exception on May 23, 2013 so that Yuan could return to M3 year in July 2013, without an accepted for publication of Yuan's first author paper.

54.    On or about June 11, 2013, Chetkovich told Plaintiff and Shea that should Plaintiff be able to complete and submit his thesis by June 24, 2013, he would consider Plaintiff's returning to M3 year in June/July 2013. Due to Chetkovich's short notice, Plaintiff had less than 13 days to complete and submit his thesis to be able to return to M3 class in June/July 2013, which was not practically feasible.

55.    Chetkovich and Peterson deliberately prevented Plaintiff from returning to M3 year in June/July 2013 by not granting the exception Plaintiff requested because Plaintiff had filed a sexual harassment complaint with the Sexual Harassment Prevention Office at Northwestern.

56. Chetkovich gave Plaintiff "special exception" only after Northwestern was informed of Plaintiff's EEOC charge, in an attempt to cover up Northwestern's retaliation against Plaintiff and to provide a facade of compliance with non-retaliation.

57. On or about June 28, 2013, more than 60 days after the meeting with Plaintiff, Slavin emailed Plaintiff the findings of her investigation on the complaint against Engman. Slavin found that "Dr. Engman did comment on your long hair and offer to give you a haircut at the 2010 retreat." Slavin also found that "it is more likely than not that Dr. Engman did make one or two other comments about your teeth and hair at these retreats."

58. However, Slavin concluded that "[ w]hile I find that these comments were ill-advised and unwelcome to you, I do not find that they were sexual in nature, and therefore do not find that they violated the Policy on Sexual Harassment." Such findings were in direct contradiction to Northwestern's own Policy on Sexual Harassment, which states that "some examples of sexual harassment may include: unnecessary reference to parts of the body... Remarks about person's gender or sexual orientation."

59. The website of Northwestern's Sexual Harassment Prevention Office also sets forth that " Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, or services or in the educational programs or activities it operates."

60.     In addition, Slavin concluded that Engman did not retaliate against Plaintiff directly or indirectly, without interviewing key witnesses. Despite the fact that Plaintiff credibly testified the numerous incidents of retaliation and adverse decisions against him and provided a list of the witnesses and other similarly situated students who were not subject to such treatment by Engman and other employees in the MSTP administration, Slavin relied more on the self-serving statements by Engman and Chekovich

61.     At the conclusion of the investigation, Slavin barely did anything to protect Plaintiff besides providing Engman the University's policy on non-retaliation and sexual harassment for review, and advising him to keep the matter strictly confidential.

62.     Due to the continuous sabotage of Plaintiff's academic achievement and adverse decisions against him by Engman and the MSTP administration, Plaintiff's graduation and return to the 3rd year of medical school, which was scheduled on or about June 21, 2013 and July 1, 2013 respectively, were significantly delayed.

63.     Plaintiff, believing that he could not get any protection or remedies he wanted through the internal procedure at Northwestern, filed a complaint with the Office of Civil Rights (OCR) on or about September 9, 2013.

64.     In addition, Plaintiff retained an attorney in or about May 2014, and notified Northwestern his intent to pursue the University through his attorneys.

65.     However, despite Plaintiff's every effort to protect himself, Engman and the MSTP continue to retaliate against Plaintiff and singled him out for different treatment and retaliatory actions.

66. Engman repeatedly included Plaintiff in his select recipient email list (as opposed to a mass email list to all MSTP members) and sent out emails on numerous occasions to some selected people at MSTP, including Plaintiff, inviting them to various events. Engman does not have any official title, role or affiliation with the MSTP -and the email was not regarding necessary educational matters.

67. This unnecessary and unwelcomed contact by Engman continues to take place even though Plaintiff has clearly communicated his desire not to have any further contact with Engman during the investigation by Slavin.

68. Engman also shared the details of Plaintiff's complaint with fellow faculty member, Dr. Stephen Miller ("Miller"), with whom Shea and Plaintiff closely collaborate on scientific research projects. Upon information and belief, Engman falsely claimed that Plaintiff had been "going around and making things up" about him. Due to this, the confidential sensitive nature of Plaintiff's complaint became known to other uninvolved individuals at Northwestern.

69. In or about June 2014, Peterson and Chetkovich contacted Plaintiff and communicated their willingness to "excuse" Plaintiff from the 2014 annual mandatory MSTP retreat which was scheduled between July 18 and July 20, 2014 because Engman will be attending the events on the first day of the 3 day retreat and they wanted to "protect" Plaintiff from Engman.

70. The MSTP retreat is a required educational activity for all MSTP students and provides invaluable networking session to connect with mentors. Since the retreat was a great

opportunity to enhance his future medical residency and career opportunities, Plaintiff had planned to attend the retreat before contacted by Peterson and Chetkovich.

71. Plaintiff reminded Peterson and Chetkovich that he never asked to be excused from any or all of the annual mandatory 2014 MSTP retreat. Plaintiff requested that Peterson and Chetkovich discuss the matter via email but Peterson and Chetkovich insisted on an in-person meeting. Later they agreed to have a conference call on the matter.

72. While Peterson and Chetkovich ostensibly offered to excused Plaintiff from the 2014 annual mandatory MSTP retreat because of their concern for his Title IX issue, Plaintiff felt as if he was being excluded from the 2014 MSTP retreat, for which attendance is mandatory and which provides the only opportunity for MSTP students to network with and learn from more senior MSTP students about post-graduation career planning, an integral part of his education at Northwestern.

73. Peterson and Chetkovich demonstrated that they would rather deprive the Plaintiff of his right and access to education and to participate in the unique networking and learning opportunity available only at the annual MSTP retreats, than find a way to accommodate Plaintiff's academic needs; and that Engman's presence at the retreat was more important than Plaintiff's academic opportunity.

74. Plaintiff acquiesced to the request by Chetkovich and Peterson, and decided not to attend the retreat on Friday when Engman would be present, thinking that any other decision would be futile.

75. Plaintiff was "excused" by Chetkovich from the first day of the 2-day 2014 mandatory annual MSTP retreat and denied of an opportunity to network with mentors and expand

his academic horizon because he filed complaint with Northwestern and several

administrative agencies, and expressed his intent to pursue Northwestern.

### COUNT I : Violation of Title IX of the Education Amendments Act of 1972 -Discrimination, Hostile Educational Environment, and Retaliation

76.  Paragraphs 1 through 75 are hereby restated and realleged as if fully set forth in Count I.

77.  Defendant Northwestern University receives federal financial assistance for its education program. Therefore, Northwestern is subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681 (a), *et seq.*

78.  Defendant owes a duty to Plaintiff to provide and ensure an educational environment free of sex discrimination and sexual harassment, and to enforce the regulations, rules, and laws necessary to protect Plaintiff from acts of sex discrimination and sexual harassment.

79.  Engman, a professor at Northwestern, repeatedly subjected Plaintiff to unwanted and unwelcomed sexual advances, made statements regarding Plaintiff's appearance, inquired of Plaintiff's sexual orientation at numerous times, and forced Plaintiff to meet with him in private for more than 7 years.

80.  Moreover, Engman started to use his authority over Plaintiff to retaliate against Plaintiff because he spurned and rebuffed such sexual advances. Even after Engman was replaced in 2011 by Chetkovich as Director of the MSTP, Engman continued to retaliate and take adverse actions against Plaintiff directly and indirectly through the new MSTP leadership.

81.  Northwestern outright refused to take any action even after it was informed of Engman's sexual harassment and retaliation toward Plaintiff through Shea because it happened long time ago even though it knew that an employee had filed a sexual harassment claim

against Engman in the past. Northwestern actively investigated similar claims filed by female students.

82. When Plaintiff reached out to the Office of Sexual Harassment Prevention, Northwestern did not initiate prompt and proper investigation and failed to recognize the fact that Engman violated the University policy even though the Director of Sexual Harassment Prevention's findings indicated that Engman engaged in conduct that was prohibited in its own policy.

83. Moreover, Northwestern failed to take any remedial action to protect Plaintiff's right at the conclusion of the investigation.

84. Due to Northwestern's deliberate indifference to Plaintiff's rights guaranteed under Title IX, Plaintiff has been further subject to direct and indirect harassment and retaliation by Engman, and such harassment created a hostile environment that effectively deprived him of the educational opportunities and benefits he was entitled to enjoy at Northwestern.

85. Defendant knew that Plaintiff has continued to be subject to be harassment and unwanted contact by Engman and its investigation procedures were not effective or sufficient to deter Engman's retaliation and harassment because Plaintiff filed a complaint with the EEOC and the Office of Civil Rights in May and September of 2013 respectively, and ultimately retained attorneys.

86. By the actions described above, Defendant Northwestern University acted to deprive Plaintiff of his rights to be free from discrimination in education on the basis of his sex and sexual orientation as provided by Title IX.

87.　By the action described above, Defendant Northwestern University retaliated and further discriminated against Plaintiff after he brought sexual harassment complaint against Engman.

88.　Plaintiff has suffered and will continue to suffer loss of substantial financial and educational benefits, humiliation, mental and emotional anguish, anxiety, and distress as a result of the discrimination, hostile educational environment, and retaliation by Defendant and its deliberate indifference.

**WHEREFORE**, Plaintiff Jonathan Woon Teck Yap respectfully ask this Court to grant the following relief:

a.　Declaration that Defendant has violated Plaintiff's rights under Title IX of the Education Amendments Act of 1972;

b.　An award of compensatory damages in an amount to be determined at trial;

c.　Judgment for punitive damages in an amount to be determined at trial;

d.　Pre- and post-judgment interest;

e.　An award of the costs of this action and reasonable attorney's fees; and

f.　Such other and further relief as this Court may deem just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted by:

Jonathan Woon Teck Yap

By: <u>/s/ Kevin F. O'Connor</u>
    One of His Attorneys

Kevin F. O'Connor # 6300449
Ryan O. Estes
O'Connor | O'Connor, P.C.
110 E. Schiller St. Ste 306
Elmhurst, IL 60126
Tel. 630-456-1596
Fax. 630-658-0336