# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JONATHAN WOON TECK YAP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14 C 9544 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

After suffering from alleged sexual harassment and retaliation by the former director of his graduate program and receiving limited redress from the University once he made his complaints known, Plaintiff Jonathan Woon Teck Yap, a graduate student, brings this suit against Northwestern University ("Northwestern") under Title IX of the Education Act of 1972, 20 U.S.C. § 1681(a), *et seq.* for discrimination, hostile educational environment, and retaliation resulting from Northwestern's alleged failure to properly investigate his complaints. Northwestern moves to dismiss Yap's Complaint as time-barred and for failure to state a claim for sexual harassment, sex discrimination, or retaliation. Northwestern's motion [10] is granted in part and denied in part. For the reasons that follow, the Court dismisses the sexual harassment claim without prejudice but finds that Yap has sufficiently pleaded his sex discrimination and retaliation claims.

## BACKGROUND[1]

Yap is a full-time student at Northwestern's Medical Scientist Training Program ("MSTP"), a combined M.D. and Ph.D. program. Yap joined the program in 2007, completed

---

[1] The facts are taken from the Complaint and are presumed true for the purpose of resolving Northwestern's motion to dismiss. *See Virnich v. Vorwald*, 644 F.3d 206, 212 (7th Cir. 2011).

his Ph.D. in 2013 and expects to complete his M.D. in May 2016. Northwestern is an institute of higher education that receives federal financial assistance for its educational programs. The MSTP is supported in part by a federal grant from the National Institutes of Health.

In October 2006, the program's then Director, Dr. David Engman recruited Yap making certain representations to him, including that: Yap could simultaneously pursue a third degree, a Master of Science in Clinical Investigation ("MSCI"), as a unique feature of Northwestern's program; Yap would be awarded a fellowship for five years; and MSTP would supplement the fellowship for the remainder of his time in the program. Based on those assurances, Yap accepted the offer of admission and enrolled in the MSTP in July 2007.

Within three months of Yap's enrollment in the program, Engman commenced "making suggestive comments about [Yap's] appearance while conspicuously looking at [Yap] and ogling him." Compl. ¶ 13. In August 2007, at the mandatory annual off-campus MSTP retreat, when Yap was aboard Engman's boat and wearing only a bathing suit, Engman complimented Yap's teeth while leering and smiling lasciviously at him. In September 2007, in a department conference room, Engman again leered at Yap and smiled in a suggestive manner while referencing Yap's teeth. At the same time, Engman began asking Yap's fellow graduate students about Yap's sexual orientation.

Around November 2007, when Yap had not responded to Engman's repeated sexual advances and sexually suggestive comments, Engman began interfering with Yap's academic opportunities. Engman opposed Yap's application for an International Health Fellowship, opposing Yap's acceptance of the same fellowship, and assigning Yap an unsatisfactory grade in a Grand Rounds course despite Yap's having completed the requirements as agreed. Engman denied Yap a paid leave of absence for a family emergency, despite routinely granting such

absences to other students. Yap describes Engman's actions against him as "continuous[] sabotage[]." *Id.* ¶ 20. Engman would use Yap's requests for an explanation of these adverse actions as an excuse to meet with Yap in private.

Engman arranged to ride alone with Yap to the August 2010 mandatory MSTP retreat, but Yap declined the offer and secured other transportation. At the retreat, Engman approached Yap while Yap was wearing a bathing suit and sitting with a fellow student. Engman commented that Yap "had really nice hair," while "leering and smiling at him creepily in a lascivious manner." *Id.* ¶ 22. Engman said Yap's "hair was really long and needed to be cut," and invited Yap to come to his hotel room later that night so he could cut Yap's hair. *Id.* "Engman's invitation was made with a very provocative sexual overtone." *Id.* Later that night, Engman stated to Yap at the mandatory dinner, "You have the most beautiful hair that I have ever seen. Don't you all agree?" *Id.* ¶ 23. About a month later, when Yap met with Engman in his office to request assistance with a class, Engman again made comments about Yap's hair and teeth in a sexually suggestive and inappropriate way.

When Yap did not respond to these sexual advances, Engman retaliated by sabotaging Yap's application for a fellowship from the Howard Hughes Medical Institute by not forwarding his application for consideration. This resulted in Yap's loss of the opportunity for career advancement as an academic physician, enhanced income, and scholastic prestige.

In August 2011, Engman again arranged for Yap to ride with him to the MSTP mandatory retreat, but Yap again declined. An emergency in his thesis advisor's laboratory meant that Yap was not able to attend the 2011 retreat.

Around October 2011, Engman was replaced as Director of MSTP by Dr. Dane Chetkovich. A sexual harassment complaint had just been filed against Engman by then Assistant Director Dr. Elise Covic.

In November 2012, Dr. Jamys Peterson, the MSTP Assistant Director since 2012, showed Yap a disciplinary letter in his student file that had been issued by Engman and Dr. Elise Covic, the MSTP Assistant Director from 2010 to 2011. That letter reprimanded Yap for missing the 2011 retreat and stated that Yap was required to travel to that retreat with Engman in his private car. The MSTP never issued letters of reprimand to students who missed the annual retreats and it was common for students not to attend for various reasons.

Even after Engman was removed from the directorship, he continued to exert control over the program and to retaliate and harass Yap directly and indirectly through his successor Chetkovich, who continued to discuss matters related to Yap with Engman.

In July 2012, Yap received an email that MSTP students could not also pursue the MSCI degree. Yap had already completed almost all the requirements for the degree at that time. Yap asked Chetkovich about the third degree option. Chetkovich asked Engman, who told Chetkovich that there was no formal arrangement between the two programs to offer MSTP students the opportunity for the MSCI degree, even though it was understood that MSTP students could take the MSCI classes. This was in contrast to Engman's representations to Yap during Yap's recruitment to the MSTP program. And despite Engman's representations to Chetkovich in 2012, a similarly situated MSTP student told Yap that in 2012 the MSTP administration "proactively and enthusiastically supported and negotiated his pursuit and conferral of the MSCI degree in 2011," during Engman's tenure as director. *Id.* ¶ 32.

Around September 2012, Yap noticed that his stipend was missing the additional fellowship funds. Yap told Chetkovich that it was his understanding that MSTP would provide this fellowship for the remainder of his time in the program. Yap's understanding of this was based on information received in 2007 and 2008 from then MSTP Assistant Director Dr. Sandra Lee. When Engman recruited Yap to the program, Engman told Lee that he had committed the program to paying the supplement through Yap's completion of both the M.D. and Ph.D. (i.e. for the sixth through eighth years of his graduate work). However, when Chetkovich asked Engman, he said that he instructed Lee to retract this offer. Engman also told Lee to tell Yap that the extended fellowship supplement was an assumption on Lee's part. Yap states that Engman's actions cost him the prestigious fellowship and caused the new MSTP leadership to believe Yap was a problem student causing administrative difficulties and irreparably damaged his relationship with them. As a result of these discussions, Chetkovich, Peterson, and other program leadership issued a disciplinary letter to Yap stating Yap was "presenting facts that he knew to be incorrect or incomplete with the intent to secure financial gain," which Yap denies. *Id.* ¶ 37.

In late November 2012, Yap told Dr. Lonnie Shea, his Ph.D. thesis advisor, about Engman's sexual harassment and retaliation. Shea told Yap to report the harassment to Northwestern's Sexual Harassment Prevention Office (the "Office").[2] Shea also informed Joan Slavin, Director of the Office, that Yap had been sexually harassed by Engman. No employee or agent of Northwestern, including Slavin, contacted Yap about Shea's report of the harassment.

---

[2] Northwestern's Sexual Harassment Prevention Office has an anti-discrimination policy on its website that states in relevant part: "Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of . . . sex, . . . sexual orientation, gender identity, gender expression, . . . or any other classification protected by law in matters of admissions, employment, housing, or services or in the educational programs or activities it operates." *Id*. ¶ 59.

5

Later, Shea told Yap that Northwestern stated it "will not follow up" with the report given that "it happened two years ago." *Id.* ¶ 41. Northwestern investigates similar sexual harassment complaints filed by female students and, on at least one occasion, has investigated a female's complaint about a two year-old incident.

On March 5, 2013, after realizing Northwestern would not take action on the matter, Yap contacted Slavin to request an investigation. Slavin did not respond promptly to Yap to find a date to schedule an appointment. Around April 2013, Slavin met with Yap and his medical school faculty mentor Dr. Deborah Reed. Although Northwestern's policy requires the prompt handling of sexual harassment complaints and Northwestern knew of a prior sexual harassment complaint against Engman, Slavin did not meet with Yap until six months after Shea made the initial report of harassment and more than a month after Yap contacted her. Slavin then conducted an investigation, talking with Engman, Chetkovich, and the Vice Dean for Scientific Affairs and Graduate Education at the medical school. Slavin did not interview key witnesses to the harassment and retaliation, including Lee and Yap's classmate who had witnessed the harassment. Slavin did not promptly conclude the investigation, despite Yap and Reed's repeated follow-up.

On or about May 30, 2013, Yap filed an EEOC charge.

While Yap's harassment complaint was pending in the Office, Yap contacted Peterson to request an exception to the MSTP policy that, in order to return to the third year of medical school, MSTP students have their Ph.D. degree and their first author publication accepted with minor revisions and without additional experiments. Yap asked for this exception because, although his first author paper had been accepted for publication, his committee members' schedules meant he could not schedule his Ph.D. defense in June 2013. Therefore, without an

6

exception, his return to medical school would be delayed by several months. Exceptions to this requirement had been granted in the past. Peterson told Yap in person and via email that he would not grant the exception. Yap and Shea were told that no exceptions to this requirement had been granted since Chetkovich took over as director and the policy had been re-announced at that time. Yap was aware that a classmate had been granted this exception on May 23, 2013 without the first author paper prerequisite. Around June 11, 2013, Chetkovich told Yap and Shea that if Yap could complete and submit his thesis by June 24, 2013, Chetkovich would consider allowing Yap to return to medical school in June/July 2013. Thirteen days to finish the thesis was not practically feasible. By not granting the exception, Chetkovich and Peterson deliberately prevented Yap from beginning the third year of medical school in June/July 2013. Yap asserts that this was in retaliation for the filing of his sexual harassment complaint with the Office. Chetkovich did grant Yap a "special exception," but only after Northwestern learned of Yap's EEOC charge, and "in an attempt to cover up Northwestern's retaliation against [Yap] and to provide a façade of compliance with non-retaliation." *Id.* ¶ 56. This significantly delayed Yap's return to medical school and graduation.

Around June 28, 2013, Slavin emailed Yap the findings of her investigation. She found that "Dr. Engman did comment on your long hair and offer to give you a haircut at the 2010 retreat." *Id.* ¶ 57. She also found that "it is more likely than not that Dr. Engman did make one or two other comments about your teeth and hair at those retreats." *Id.* Slavin concluded, "[w]hile I find that these comments were ill-advised and unwelcome to you, I do not find that they were sexual in nature, and therefore do not find that they violated the Policy on Sexual Harassment." *Id.* ¶ 58. Yap pleads that this conclusion is in direct conflict with Northwestern's Sexual Harassment Policy that states, "some examples of sexual harassment may include:

7

unnecessary reference to parts of the body . . . [r]emarks about person's gender or sexual orientation." *Id.* Slavin did not interview key witnesses and credited Engman and Chetkovich's statements over Yap's in concluding Engman did not retaliate against him. Slavin's only actions to protect Yap at the conclusion of the investigation were to provide Engman with Northwestern's policy on non-retaliation and sexual harassment and to advise him to keep the matter strictly confidential.

Around September 9, 2013, Yap filed a complaint with the Department of Education's Office for Civil Rights ("OCR") because he believed that Northwestern's internal procedure could not provide him the protection or remedies he was seeking. Around May 2014, Yap retained an attorney and notified Northwestern of his intent to pursue legal action.

Yap asserts that Engman and the MSTP program continued to retaliate against him and single him out for differential treatment. Engman repeatedly included Yap in a selected MSTP recipient email list about non-educational events, despite the fact that Engman does not have any official title, role, or affiliation with MSTP. This continued communication with Engman was unwelcome and unnecessary and occurred despite Yap's clear communication to Slavin during the investigation that he wished to have no further contact with Engman. Engman also discussed Yap's complaint with another faculty member with whom Yap and his advisor Shea work closely on research projects. Engman told this faculty member that Yap had been "going around and making things up about him." *Id.* ¶ 68.

Around June 2014, Peterson and Chetkovich told Yap that he could be "excused" from the 2014 mandatory annual MSTP retreat in July because Engman would attend the first day of events and they wanted to "protect" Yap from Engman. *Id.* ¶ 69. The MSTP retreat is a required educational activity for MSTP students providing networking with mentors and the opportunity

8

to enhance future career opportunities. Yap had planned to attend the retreat before being contacted by Peterson and Chetkovich. Yap told Peterson and Chetkovich that he did not ask to be excused from the retreat. Yap felt that, despite the given reason for the offer, he was being excluded. Yap did agree to forgo the first day of the retreat. Yap contends that Peterson and Chetkovich excused him in retaliation for his Northwestern, EEOC, and OCR complaints.

Yap filed his Complaint in this Court on November 26, 2014, alleging a Title IX discrimination, hostile educational environment, and retaliation claim against Northwestern.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

**I.     Title IX Sexual Harassment Claim**

    **A.     Statute of Limitations**

As an initial matter, Northwestern argues that Yap's sexual harassment claim is time barred because any harassment by Engman ended by 2010 at the latest and Yap filed this action in November 2014. Yap counters that his claim for Title IX violations accrued when he learned, after Shea's initial complaint on his behalf in late November 2012, Northwestern would not be following-up on his complaint.

Title IX actions, like other federal civil rights cases, are governed by the applicable state law personal injury statute of limitations. *Doe v. Howe Military Sch.*, 227 F.3d 981, 987 (7th Cir. 2000) (statute of limitations for Title IX claims are taken from the state limitations period for personal injury cases). Therefore, Yap's Title IX claim falls under Illinois' two-year statute of limitations. *See Singleton v. Chicago Sch. Reform Bd. of Trs. of Bd. of Educ. of City of Chicago*, No. 00C395, 2000 WL 777925, at *19 (N.D. Ill. June 13, 2000) (applying two year Illinois statute of limitations for personal injury). Federal law, however, determines the accrual date of the claim, which is the date when the plaintiff knows or has reason to know that his rights have been violated. *See id.* (citing *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1991)).

Yap's characterization of his sexual harassment claim is one for hostile educational environment stemming from Northwestern's treatment of his complaint. The statute of limitations for this claim is measured not by incidents of underlying sexual harassment, but from Yap's interactions with the Office about his complaint. Yap alleges that in late November 2012, he first reported the harassment to his thesis advisor, Shea, who told Yap to report the harassment to the Office and then told Yap that Northwestern "will not follow up" on Yap's

report because the harassment "happened two years ago." Compl. ¶¶ 38–39, 41. Yap further alleges that he contacted Slavin on March 5, 2013 to request an investigation, but Slavin did not promptly find a date to meet with him. Slavin finally met with Yap in April 2013 and subsequently conducted an investigation that Yap contends was insufficient. Yap's interaction with the Office, including Shea's inquiry on his behalf and then Yap's initial personal contact, prompted when he "realiz[ed] that Northwestern will not take any action on the matter," all occurred after "late November 2012." *Id.* ¶ 43. Reading the Complaint in the light most favorable to Yap, as the Court must at this stage, Yap has sufficiently pleaded that the events related to Northwestern's handling of his complaint fall within the two year statute of limitations. *See AnchorBank*, 649 F.3d at 614.

To the extent Yap has pleaded a hostile work environment sexual harassment claim based on Northwestern's treatment of his complaint against Engman, that claim is not barred by the statute of limitations.

### B. Failure to State a Claim

Northwestern also moves to dismiss on the basis that Yap's Complaint fails to state a claim under Title IX for sexual harassment. Yap argues that he has "sufficiently alleged a claim for sexual harassment under Title IX for the underlying sexual harassment by Engman," even though "this instant action is based on Northwestern's own discrimination against [Yap] based on his gender, not necessarily the sexual harassment by Engman himself." Resp. at 14.

Title IX prohibits sexual harassment and sex discrimination in connection with educational programs or activities that receive federal funding. *See* 20 U.S.C. § 1681(a). A Title IX plaintiff may allege sexual harassment under two theories: *quid pro quo* and hostile environment. *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1021 (7th Cir. 1997). Title

11

IX does not allow *respondeat superior* liability, however. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287–90, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) (concluding Congress did not intend educational institutions to be liable for sexual harassment of which it was unaware). Rather, a school official "who at a minimum has authority to institute corrective measures" must have "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct" and have been deliberately indifferent to that misconduct. *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012).

Northwestern cannot, as a matter of law, be liable for any alleged sexual harassment until notified of that harassment. Therefore, only acts of harassment alleged to have occurred after Yap notified a Northwestern official are actionable. Yap states that he told his thesis advisor, Shea, in "late November 2012" about Engman's actions.[3] Compl. ¶ 38. However, Yap does not plead any qualifying episodes of harassment after late November 2012. The only potential incidents after November 2012 cannot be described as sexual. First Yap states that Engman included him in emails sent to a select recipient email list inviting MSTP members to various, non-educational events and second, Yap alleges that Engman spoke about Yap's complaint with another faculty member. *Id.* ¶¶ 66–68. Neither of these incidents qualify as sexual harassment—inclusion on a group email list for events, without any allegations of a sexual nature to the emails, does not rise to the level of harassment, and Engman's breach of confidentiality about Yap's complaint to another faculty member is not sexual or related to Yap's gender. *See Johnson v. Hondo, Inc.* 125 F.3d 408, 412 (7th Cir. 1997) (affirming finding that comments "did not cross the line that separates the merely vulgar and mildly offensive from the

---

[3]The Court specifically does not make any finding as to whether Shea is an "official" for purposes of Title IX liability. The only two potential incidents occur after Yap notified both Shea and Slavin. Therefore whether the Court considers Yap's contact with Shea or Slavin as Northwestern's first notice of the complaint for Title IX purposes does not affect the analysis here.

deeply offensive and sexually harassing" (citation omitted) (internal quotation marks omitted));
*Howard-Ahmad v. Chicago Sch. Reform Bd. of Trs.*, 161 F. Supp. 2d 857, 865 (N.D. Ill. 2001) ("Although this conduct does not need to be expressly sexual, it must be of a sexual character.").

Because Yap does not allege that any incidents of sexual harassment occurred after he reported his complaint to Northwestern, he has failed to state a claim for sexual harassment against Northwestern under Title IX. *Ha v. Northwestern Univ*, No. 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) ("[T]he Complaint does not allege any subsequent acts of harassment on Ludlow's part so there was no further action required to be taken by Northwestern to avoid Title IX liability."). Therefore, Yap's sexual harassment against Northwestern (whether based on a *quid pro quo* or hostile environment theory) is dismissed without prejudice.

## II. Title IX Sex Discrimination Claim

Yap also brings a claim against Northwestern for sex discrimination in its handling of his complaint against Engman. Northwestern argues that this claim fails because Yap has not pleaded a materially adverse action or connected his gender to the alleged problems with Northwestern's investigation.

To plead a claim for Title IX sex discrimination, Yap must allege: (1) that he "was excluded from participation in or denied benefits of or subjected to discrimination in an educational program; (2) that receives federal financial assistance; and (3) that the exclusion was on [the] basis of sex, i.e. gender." *Torrespico v. Columbia Coll.*, No. 97 C 8881, 1998 WL 703450, at *17 (N.D. Ill. Sept. 30, 1998). Yap need not plead specific facts, but he "must provide either facts or conclusory allegations sufficient to put [Northwestern] on notice of his claim and from which the Court can infer that he has a cause of action." *Id.* at *18. This

13

includes some particularized allegations that would allow the Court to infer a causal connection between his treatment and gender bias." *See id.* at 18 n.11.

Yap alleges that Northwestern did not promptly respond to his sexual harassment complaint because he is male, while Northwestern promptly investigates similar complaints by female students. Yap also claims that, on at least one occasion, Northwestern investigated a sexual harassment incident that was over two years old when brought by a female student. These allegations sufficiently connect Northwestern's initial refusal to investigate with Yap's gender. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715–16 (2d Cir. 1994) (detailed allegations that drew causal connection between flawed outcome of investigation and plaintiff's gender sufficient to survive motion to dismiss). Yap pleads that he filed an EEOC charge while the investigation was pending due to his frustration with Northwestern's handling of his complaint. The Court can therefore infer that Yap alleged adverse treatment based on his gender in the EEOC complaint. Although somewhat conclusory, the Court finds that Yap's allegations do raise the plausible inference that Northwestern did not promptly respond to his complaint because he is male. *Cf. Doe v. Columbia Univ.*, --- F. Supp. 3d ----, 2015 WL 1840402, at *15–16 (S.D.N.Y. Apr. 21, 2015) (dismissing complaint based on conclusory statements of gender-bias, but noting that complaint did not include "allegations that similarly situated women or even men would be treated differently"). This sufficiently put Northwestern on notice of his allegation of intentional sex discrimination in its response to his complaint. Yap makes only general allegations, however, about Northwestern's procedures during the investigation and the investigation's outcome, without specifically linking those complaints to his gender. Yap cannot sustain his sex discrimination claim based on those allegations. *See Ludlow v. Northwestern Univ.*, --- F. Supp.

3d ----, 2015 WL 508431, at *7 (N.D. Ill. Feb. 5, 2015) (list of problems with investigation did not contain an explicit or implicit link to sex or gender and therefore failed to state a claim).

Yap has also sufficiently pleaded materially adverse consequences in his educational experience. Yap has alleged repercussions beyond the failure to promptly investigate including that Engman remained in contact with him and turned current department leadership against him. *Cf. Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 803–804 (N.D. Ill. 2014) (finding failure to adequately investigate a complaint was not a materially adverse action, but noting that "a failure to investigate [one employee's complaint about another] could, under appropriate circumstances, qualify as an adverse employment action"). [4] He further states that Slavin did nothing to protect him from Engman, besides giving Engman a copy of Northwestern's non-retaliation and sexual harassment policy and telling him to keep the matter confidential. According to Yap, Engman continued to contact him despite Yap's having clearly communicated to Slavin his desire to have no further contact with Engman. Further, Yap states that Engman continued to retaliate against him by communicating misinformation to the current leadership of the program. This in turn damaged Yap's relationship with the current program leadership and led them to excuse Yap from one day of the mandatory retreat, a valuable educational and networking opportunity.

The Court finds that, taken together and in the light most favorable to Yap, the Complaint sufficiently states a claim for sex discrimination in Northwestern's failure to promptly investigate Yap's sexual harassment and retaliation complaint.

---

[4] Northwestern's citation to *Ludlow* here is inapposite. In *Ludlow*, the plaintiff university professor alleged that Northwestern's investigation into complaints about his behavior was a Title IX violation. *See Ludlow*, 2015 WL 508431, at *5 n.5 ("[I]f the Court were to consider Ludlow's Title IX claim as a Title VII claim, that claim must fail because an investigation by an employer, without more, is not an adverse action."). Yap is not alleging that the investigation itself harmed him. Quite the opposite, Yap claims that he suffered adverse educational consequences because Northwestern failed to properly investigate his complaint.

**III. Title IX Retaliation Claim**

Northwestern seeks dismissal of Yap's retaliation claim on the grounds that Yap has not alleged any adverse actions and Yap does not state a causal connection between the alleged retaliation and his protected activity. Yap argues that this claim is sufficiently pleaded and that the Court should look at the context and totality of the circumstances.

To state a Title IX retaliation claim, Yap must allege that he engaged in protected activity and that Northwestern subjected him to an adverse action because of that protected activity. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005). Courts routinely use Title VII cases to interpret Title IX's retaliation framework. *Milligan*, 686 F.3d at 388.[5] Mere inconveniences are not actionable adverse actions. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (explaining a materially adverse action means "more than a mere inconvenience or an alteration of job responsibilities," and "may include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" (citations omitted) (internal quotation marks omitted)). Actionable retaliation may affect the terms and conditions of Yap's educational experience, but can also include actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

---

[5] The Supreme Court recently held Title VII retaliation claims must be proved according to traditional principles of but-for causation, i.e. a Title VII retaliation claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). No circuit court has yet determined whether this higher causation standard applies to Title IX retaliation claims, but several district courts have noted *Nassar* and this question. *See, e.g.*, *Doe v. Rutherford County, Tenn., Bd. of Educ.*, No. 3:13-cv-00328, 2014 WL 4080163, at *15–16 (M.D. Tenn. Aug. 18, 2014) (discussing cases without deciding whether *Nassar* applies to Title IX).

As an initial matter, the retaliation of which Yap complains must have occurred, at the very earliest, after his late November 2012 reporting of the harassment to Shea. *See Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (retaliation may not precede the protected activity). Yap's complaints about being denied the ability to finish the third degree and the end of his supplemental stipend, therefore, cannot be considered retaliatory acts. Yap's allegations about the disciplinary letter in his file are somewhat murky—he states he was shown the letter in November 2012, but the letter was likely written sometime before that, probably in August 2011, and therefore there is a question as to whether that letter can be considered retaliatory considering the timeline. But in any event, Yap further states that departmental leadership prevented him from returning to the third year of medical school by refusing to grant him an exception that had been granted to one of his classmates, and that this refusal was in retaliation for the sexual harassment complaint. Yap alleges that Northwestern eventually granted him the exception "in an attempt to cover up" the retaliation after it learned that he had filed an EEOC charge. Compl. ¶ 56. Nevertheless, Yap states his graduation was significantly delayed due to these events. Yap also states that Engman revealed confidential information about Yap's complaint and claimed Yap fabricated the allegations. These comments were made to a faculty member with whom Yap and his thesis advisor collaborate. Yap finally asserts that departmental leadership excluded him from the 2014 mandatory retreat in retaliation for the sexual harassment complaint, his EEOC and OCR complaints, and his threat to file a lawsuit. Yap would attend part, but not all, of this retreat. Failing to graduate on time, exclusion from educational events, and reputational harm within the department, taken together, are sufficiently adverse to deter a reasonable student from filing a sexual harassment claim. *See Burlington*, 548 U.S. at 69 (explaining, "[T]he significance of any given act of retaliation will often depend upon the

17

particular circumstances. Context matters."). Yap has adequately pleaded that Northwestern took adverse actions against him because of his complaints. *See Doe v. Salisbury Univ.*, --- F. Supp. 3d ----, 2015 WL 3478134, at *5 (D. Md. 2015) (finding plaintiff sufficiently pleaded retaliation, noting suspicious timing of investigation to complaint). The Court will not dismiss Yap's retaliation claim.

## CONCLUSION

For the foregoing reasons, Northwestern's motion to dismiss [10] is granted in part and denied in part. Yap's sexual harassment claim is dismissed without prejudice. Yap's sex discrimination and retaliation claims may proceed. The Court gives Northwestern until August 28, 2015 to file its answer to the remaining allegations in Yap's complaint.

Dated: August 6, 2015

SARA L. ELLIS
United States District Judge